NOTICE
Decision filed 08/12/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240274-U

NO. 5-24-0274

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 21-CF-518 |
| | ) | |
| WILLIE A. CURRIE, | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BOIE delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the defendant's convictions where the defendant was not prejudiced by defense counsel's performance at trial, the trial court conducted an appropriate preliminary *Krankel* inquiry, and the trial court's denial of the defendant's claims of ineffective assistance of counsel was not manifestly erroneous.

¶ 2    The defendant, Willie A. Currie, appeals his November 2, 2023, conviction for aggravated domestic battery in violation of section 12-3.3(a-5) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.3(a-5) (West 2020)) and domestic battery with three prior convictions in violation of section 12-3.2(a)(1) of the Code (*id.* § 12-3.2(a)(1)). He argues that defense counsel provided ineffective assistance when she failed to object at the defendant's bench trial to references by the State to its motion *in limine* and further argues that the trial court improperly limited the defendant's presentation of claims regarding ineffective assistance of counsel. For the reasons set forth below, we affirm the judgment of the trial court.

1

¶ 3                                    I. BACKGROUND

¶ 4      The defendant was originally charged by information on May 7, 2021, in Macon County,

Illinois. The charges were amended throughout the proceedings, and the defendant ultimately

proceeded to a bench trial on one count of aggravated domestic battery and two counts of domestic

battery with three prior convictions. Count I charged the defendant with aggravated domestic

battery and alleged that on April 26, 2021, the defendant strangled Ivie Copeland, a family or

household member of the defendant, by applying pressure to her neck, thereby impeding her

normal breathing or the circulation of her blood, in violation of section 12-3.3(a-5) of the Code

(*id.* § 12-3.3(a-5)). Counts II and III charged the defendant with domestic battery with three prior

convictions; both counts alleged that the defendant grabbed Copeland by the neck with his hands

and kicked her body with his foot, and both counts identified the defendant's prior convictions in

Macon County Case Nos. 2010-CF-893, 2016-CM-1163, and 2017-CF-616, in violation of section

12-3.2(a)(1) of the Code (*id.* § 12-3.2(a)(1)). Count II alleged that the defendant's actions caused

bodily harm to Copeland and count III alleged that the defendant made physical contact of an

insulting or provoking nature with Copeland.

¶ 5      On September 9, 2021, the State filed its first motion *in limine* asking the trial court to

allow the State to introduce evidence of the defendant's convictions for three prior domestic

violence offenses. On September 15, 2021, the State filed its second motion *in limine* alleging that,

between May 6, 2021, and May 9, 2021, telephone calls occurred between the defendant and

Copeland while the defendant was incarcerated in the Macon County jail, and asking the trial court

to rule on the admissibility of the jail calls prior to trial. The second motion *in limine* alleged that

during the conversations, the defendant made statements from which the jury could infer that the

2

defendant was guilty, and also that he had encouraged Copeland not to testify truthfully and completely.

¶ 6    The State also filed a document entitled "Supplemental Information Concerning Jail Call Evidence" (supplement). The supplement stated that five relevant jail calls had occurred, and those had been edited into six audio clips. After providing foundation information and admissibility argument for the jail calls, the supplement set forth the State's theory of the case and then provided summaries for each of the jail calls, including alleging that during the calls the defendant offered Copeland $1,000, a van, and to pay any resulting fines if she recanted her story.

¶ 7    Both motions *in limine* were heard on September 23, 2021. Regarding the first motion *in limine* to admit evidence regarding the defendant's prior domestic battery convictions, the trial court noted that the parties had argued regarding proximity in time, factual similarity to the current offense, and other relevant facts and circumstances. The trial court then explained that propensity evidence of the nature sought would generally be admissible to demonstrate motive, intent, or absence of mistake, as well as the defendant's volatile nature, but that it must bear some similarity to the charged offenses. The trial court then expressed its concern that the State was only seeking to provide copies of the charging documents from the prior convictions to the jury with no additional context, and that those charging documents would not be probative and would be prejudicial. The trial court denied the first motion *in limine*.

¶ 8    Regarding the second motion *in limine*, the trial court stated that it had read the motion, had listened to both the edited and unedited versions of the jail calls in chambers, and had read the supplement. The trial court had also read the defendant's response to the motion. The second motion *in limine* was granted, and the jail calls were deemed admissible so long as a proper foundation was laid at trial.

3

¶ 9      The State then filed a third motion *in limine* on September 28, 2021, claiming that while the trial court had denied its motion to admit charging documents and affidavits regarding the defendant's prior domestic violence convictions, the State should be permitted to submit to the jury certified copies of the prior convictions. A hearing on that motion occurred on October 5, 2021, and defense counsel argued against the motion, noting that there were no factual similarities between the prior convictions and the current offense other than the cases were all for domestic battery, and that one of the cases also involved strangulation, but that had occurred 11 years prior to the current incident. Defense counsel concluded that allowing the convictions to come in would be highly prejudicial. After a lengthy exchange with counsel and a discussion of the relevant case law, the trial court permitted the parties time to submit briefs on the issue.

¶ 10     The State filed a brief in support of the third motion *in limine* on October 8, 2021, and the trial court subsequently denied the motion by written order on October 12, 2021. The State appealed the denial of its first and third motions *in limine*, and on appeal the Fourth District held that the certified copies of conviction alone, without further evidence relating to the prior crimes, would be admissible at trial to show the defendant's propensity to commit acts of domestic violence. *People v. Currie*, 2022 IL App (4th) 210598, ¶ 102.

¶ 11     The case was remanded to the trial court, and the defendant executed a jury waiver and proceeded to a bench trial on November 2, 2023. During the State's opening statement, it noted that it would seek to play five or six jail calls that it had summarized in its supplement, and regarding the content of the jail calls stated,

> "[T]here is one place where the defendant admits to having
> committed the crime, and there's another place *** the defendant
> begging the victim to not testify, to fill out an affidavit to say that

4

*** this didn't happen and for her to take an obstructing justice charge in order to get him out of the crime."

¶ 12    Copeland testified that she had been at the defendant's home on April 26, 2021. When Copeland asked the defendant to take her home, the defendant tried to prevent Copeland from leaving. Copeland exited the home and attempted to get into a truck. The defendant followed, and he struck and kicked Copeland. He then choked her until she lost consciousness. When she regained consciousness, Copeland attempted to walk down the street, but the defendant threw multiple car seats at her and struck her again. The defendant then picked Copeland up in a vehicle and drove her to her father's home. Copeland had swelling, red marks, and bruises on her face, neck, arms, and legs, and photographs of her condition were admitted into evidence. When her father learned what had occurred, he called the police.

¶ 13    Copeland then provided foundation testimony for one of the jail calls that had occurred between herself and the defendant after his arrest, and the State played the edited clip labeled as exhibit C3 for the trial court. In that call, Copeland identified herself as Ivie, and the defendant attempted to identify her as someone else named Daisy. He responded, "No, Daisy. This Daisy. This Daisy. You see what I'm saying? This Daisy." He then said, "Daisy, why you ain't, why they not coming down here?" and then "Daisy, why they didn't come down here and say they made a false police report?" Copeland responded, "I can't." The defendant then corrected this response to, "*She* can't? Why *she* can't?" Copeland explained that she could not do anything for 72 hours, including having contact with the defendant. The defendant asked if, after 72 hours, Copeland could go down and say that she filed a false complaint.

¶ 14    During the call, the defendant also said that Daisy had never been in trouble and Daisy could file a false police report. He said they will try to "spook" Daisy, but Daisy had nothing in

5

her background. He said they would get her with obstructing justice, but that was nothing but a notice to appear and bond. Copeland responded, "She might go to jail, and there might be two thousand in fines on top of that." The defendant responded that she might, but she would not go anywhere, and it would just be a $200 bond, and he had that. He added that he had a van for her "right now" and asked why she would not agree to that. He then explained that his charges were not probationable. He said he knew he "f*** up" but he loved his kids and wanted to be around them. He said he could not do seven years. He also said that he was on fire in jail and they were not giving him medicine or anything, and he was going through it hard.

¶ 15    The defendant then asked someone in the background what would happen to a person who had never been arrested and admitted to making a false police report. After an exchange with that background individual, the defendant then addressed Copeland and said that she would be charged with obstruction of justice, that it was just a bond and a misdemeanor, that it was "not bad," and that she would get nothing but a fine. He explained to Copeland repeatedly that nothing would happen to her. He urged Copeland to promise that she would state that she made a false police report, take the charge, and not get spooked. In this one call the defendant made statements of this nature, urging Copeland to take an obstruction of justice charge, over and over.

¶ 16    The State then offered into evidence, as People's exhibit 6, a thumb drive containing all five of the full jail calls, as well as the six edited clips. The trial court asked the State what the other clips which had not been played in court contained, and the State responded, "They're all described in the filing, September 15th filing." The State then explained that the next clip to be played was the one where the defendant offered Copeland $1,000 and a van to recant her story. As the State attempted to describe the clip after that, the trial court stated, "I don't see any filing in the court file." The State offered to provide the trial court with its own copy of the supplement.

6

The trial court then identified the date that the supplement was filed. After inquiring about the length of the jail call clips, the trial court stated, "I don't want to hear a bunch of repetitive information that doesn't help me decide the case," and then noted that the State was moving to introduce the thumb drive and asked defense counsel if she had any objection. After clarifying that the thumb drive did indeed contain both the full original audio clips of the jail calls and the edited versions, defense counsel did not object to the exhibit, stating that only to the extent that sentencing was discussed in the clips, the trial court should disregard those portions. The trial court stated that it would disregard any irrelevant information.

¶ 17    The State then stated that, to the extent that the audio clips were in evidence and there was a description of the calls in the court file, it would move on if the trial court was satisfied; otherwise it would play the audio clips. The trial court responded that it was the State's case, and the State should present its case. The State then played the second edited clip. The trial court inquired as to which clip had been played and the State identified that it had been labeled C5, and stated that it was "all described in the memo [the trial court] had before [it]." Clip C5 included a discussion between Copeland and the defendant regarding Copeland receiving $1,000 and a van, as well as bond money for Copeland. The State then played the clip labeled C4. Clip C4 included the defendant stating that Copeland cannot communicate with the State by phone and that she has to come down in person. He also stated in the call that Copeland would get a slap on the wrist and a fine. Copeland ultimately assures the defendant repeatedly that she will do it. They refer to each other as Will and Ivie during the call. The State then played another audio clip labeled C2, and the trial court noted that Copeland had testified that during the calls, the defendant said the same thing "over and over." The trial court then asked if it was going to hear something new on the additional audio clips. The State indicated that it would not be playing the two remaining edited clips. The

7

trial court noted that the clips were included on the exhibit, and asked if they were similar in nature to the clips that had already been played. The State responded, "Yes, Judge."

¶ 18    During the cross-examination of Copeland, defense counsel asked Copeland if she had waited to provide information regarding the incident until after the State had agreed to quash her warrants, and Copeland confirmed that was accurate. Copeland denied having any other cases or arrests pending. Copeland agreed that she previously had a juvenile abuse/neglect case pending, but that she had lost her parental rights, so that case was no longer active. Defense counsel asked her if she was currently using any controlled substances, alcohol, or anything of that nature, and Copeland denied any such use. Copeland admitted that at a previous court date, she had told the defendant that her warrant had been quashed, that she would be coming to court to testify, and that she was doing what she had to do to get her children back. She clarified that she believed that it might help her to get her children back if she could get this case against the defendant dealt with.

¶ 19    After presenting its witnesses, the State moved to introduce certified copies of the defendant's prior domestic battery convictions into evidence. While those exhibits appear to have been admitted at trial, they are not included in the record on appeal.

¶ 20    After hearing the remainder of the evidence, the trial court found the defendant guilty on counts I and II, noting that count III would merge into count II. With regard to the trial court's assessment of the evidence, it noted Copeland's testimony, photographs of her injuries, and the jail calls. Regarding those calls, the trial court noted that the defendant was obviously trying to convince Copeland not to testify, and that the defendant offered Copeland money and a van if she would state that she lied and accept prosecution for obstructing justice. The trial court noted that the defendant said this "over and over" again in the jail calls.

8

¶ 21    On November 30, 2023, a presentence investigation report (PSI) was filed setting forth the defendant's prior domestic battery criminal history as follows, all within Macon County: (1) a conviction for aggravated domestic battery involving strangulation, a Class 2 felony, in Case No. 2010-CF-00893 resulting in a 4-year sentence to the Illinois Department of Corrections (IDOC); (2) a domestic battery case involving physical contact, a Class A misdemeanor, in Case No. 2016-CF-01076, for which the defendant served 14 days in jail and was further sentenced to 12 months of conditional discharge; (3) a conviction for domestic battery involving bodily harm, a Class A misdemeanor, in Case No. 2016-CM-01163, for which the defendant served 14 days in jail; and (4) a conviction for domestic battery with prior convictions, a Class 4 felony, in Case No. 2017-CF-00616, for which the defendant served 89 days in jail and was further sentenced to 24 months' probation. Corrections were made to the PSI on December 7, 2023, but the relevant criminal history remained the same.

¶ 22    On December 4, 2023, the defendant filed a *pro se* posttrial motion entitled, "Motion To Dismiss Public Defenders Office Due Irreconciable [*sic*] Differences / And Appoint *Pro Bono* Counsel from Private Law Firm." The motion stated, *inter alia*, that the defendant's first attorney, the public defender, had stated that if the defendant refused to plead guilty she would make sure he was found guilty of the offense by (1) refusing to object to a new trial, (2) refusing to object to any reference to the prior domestic violence charge in Case No. 2017-CF-616, which the defendant alleged had been expunged from his record pursuant to his successful completion of "Unconditional Discharge/Unsupervised Probation," and (3) refusing to put on a viable defense. He further alleged that the public defender was going to have an assistant public defender from her office sabotage the defendant's posttrial motions for acquittal and for a new trial, and his appeal.

9

¶ 23    On December 7, 2023, prior to the defendant's sentencing hearing, the trial court initially ruled that the defendant's *pro se* posttrial motion was stricken pursuant to his being present and represented by the public defender. After hearing argument from counsel, the trial court changed its ruling and construed the defendant's motion as alleging ineffective assistance of counsel. The trial court then conducted a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), where our supreme court set forth the procedure for claims of ineffective assistance of counsel.

¶ 24    The trial court asked the defendant about his first allegation that the public defender intended to make sure the defendant was found guilty. The defendant stated that he only had two prior domestic battery convictions, and that he alerted the public defender of this, but she refused to pursue that issue. The public defender then explained to the trial court that there had been convictions in 2010-CF-893, 2016-CM-1163, and 2017-CF-616, and that while the defendant did not agree that the last case resulted in a conviction, there was a conviction entered in the case. Regarding the use of those cases at trial, the public defender explained that at the hearing on the motion *in limine* regarding admission of the prior convictions at trial, she had argued extensively that those convictions should have been excluded. The trial court then stated that the three prior convictions were correct, and that it had allowed the evidence of those convictions at trial over the defense's objection, but that it had given those prior convictions limited weight. Also relevant to the defendant's first claim, the public defender stated that she had never told the defendant that if he refused to plead guilty, she would make sure that he was found guilty.

¶ 25    The trial court then asked the defendant to explain the second allegation set forth in his motion, that the public defender intended to sabotage his posttrial motions. The defendant explained his position that the public defender did not look into his case, where his conviction was

10

for a 2021 charge that had been dismissed and then "brought back up." The defendant explained that Copeland had been facing legal issues involving warrants and a custody battle with the defendant, and that Copeland had testified against the defendant to get herself out of trouble. The defendant stated that Copeland made a deal with the State to testify in exchange for her warrants being dismissed and getting her children back, and that she was also acting as an informant for the police. The defendant claimed that the public defender was aware of this and did not bring it up at trial, and the defendant believed that the public defender would not be doing anything to come back to court and change the verdict.

¶ 26    The trial court noted that the public defender had examined Copeland extensively regarding any deal she had made, and the public defender emphasized for the trial court that her main approach for impeachment had been to highlight at trial that Copeland had a pending misdemeanor case and a pending juvenile abuse/neglect case during the proceedings, and that her misdemeanor case was dismissed after she spoke with the State about the defendant's case. The public defender had also asked Copeland at trial if she was working for the police and she had responded that she was not. The public defender noted that Copeland had her parental rights terminated prior to trial, and so she did not receive her children back as part of any agreement. Finally, the public defender noted for the trial court that she had not sabotaged the defendant's case, that the case was put on hold while an interlocutory appeal regarding a motion *in limine* was pending, and that when jurisdiction over the case was returned to the trial court, the case was put back on the trial docket. Regarding the defendant's allegation that the charges had been dismissed and reinstated, we note that the record on appeal does not reflect that the charges were dismissed at any point in the proceedings.

11

¶ 27 As the trial court began to announce its ruling on the defendant's motion, the defendant requested to say something. The trial court told him to wait and continued to announce its findings that the defendant's allegations of ineffective assistance lacked merit, and so the trial court would not proceed to a full *Krankel* hearing. The trial court then asked the defendant what else he wanted to state, briefly, and the defendant further alleged that Copeland was using drugs at the time of the trial but was never tested, and that he believed that Copeland testified falsely against him to stay out of trouble regarding her drug use.

¶ 28 The trial court then heard arguments on the defense's posttrial motion for acquittal or a new trial, and the defense highlighted that the defendant's prior convictions should not have been permitted for use at trial. The defense further argued that the only eyewitness was Copeland, and she was impeached pursuant to her deal with the State. The trial court denied the motion for acquittal or a new trial and then proceeded to sentencing. After hearing argument and witness testimony, as well as the defendant's statement, the trial court sentenced the defendant to five years' incarceration in IDOC with a four-year period of mandatory supervised release (MSR) on count I, and three years' incarceration in IDOC with a three-year period of MSR on count II, to run concurrently.

¶ 29 The defendant filed a motion to reconsider his sentence, which was heard on March 27, 2024. After considering the pleadings, facts, and arguments, the trial court denied the motion. The defendant then timely filed this appeal.

¶ 30                                    II. ANALYSIS

¶ 31 On appeal, the defendant argues (1) that the State improperly referenced the jail call descriptions in the supplement as a substitute for presenting the calls themselves, and defense counsel's failure to object to those references amounted to ineffective assistance of counsel, and

12

(2) that the trial court prevented the defendant from fully presenting his allegations of ineffective assistance of counsel at the preliminary *Krankel* inquiry.

¶ 32                           A. Jail Call Summaries

¶ 33    The defendant first argues that defense counsel had a duty to ensure that the State used only competent evidence at the defendant's trial, and defense counsel's failure to object to the State's reference to its argumentative supplement summarizing the jail calls, at periods during the trial outside of opening and closing statements, amounted to ineffective assistance of counsel.

¶ 34    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and counsel's errors resulted in prejudice. *Albanese*, 104 Ill. 2d at 525. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 35    To be successful in a claim for ineffective assistance of counsel, the defendant must satisfy both prongs. *Strickland*, 466 U.S. at 697. However, while a defendant must satisfy both prongs to be successful in an ineffective assistance claim, we may dispose of such a claim by examining the prejudice prong alone. *Albanese*, 104 Ill. 2d at 527.

¶ 36    The defendant points to an exchange during trial where, after playing several of the jail call clips, the State said it would not play the remaining clips in court, and the trial court asked if those additional clips were on the exhibit and similar in nature. The State confirmed that this was the case. The defendant asserts that when the trial court referred to "the exhibit," this was a reference to the supplement, and that defense counsel at trial was unreasonable for failing to object to introduction of the supplement as evidence.

¶ 37    The record clearly contradicts the defendant's claim. There is no point where the supplement is offered for admission into evidence, and it is not included as evidence in the record on appeal. What is included is a thumb drive that was admitted into evidence and contains all of the audio of the jail calls in full, as well as the trimmed clips presented at trial by the State. There is nothing that indicates that the trial court is referring to the supplement, rather than the thumb drive, when it asks if all of the clips are on the exhibit.

¶ 38    The defendant claims, however, that the trial court clearly considered the supplement as evidence, because the trial court stated in its verdict that the defendant offered Copeland money and a van "over and over" again, and this was not supported by the audio clips played in court. The defendant argues that the trial court could only have come to the conclusion that money and a van were offered "over and over" by reviewing the summaries contained in the supplement. The defendant claims that this rebuts any presumption that the trial court only considered competent evidence.

¶ 39    As set forth in the background section, the jail call clips that were played at trial do indeed contain audio of the defendant indicating to Copeland that she would receive money and a van in exchange for her taking an obstruction of justice charge, and urging her to do so many times over.

14

The defendant's blatantly false assertion that such a conclusion could only have come from the supplement completely lacks merit and directly contradicts the record.

¶ 40    In a bench trial it is presumed that the trial court considered only competent evidence in reaching its verdict. *People v. Naylor*, 229 Ill. 2d 584, 603-04 (2008). That presumption is only rebutted where the record affirmatively shows the contrary; only when it affirmatively appears from the record that the trial court considered incompetent evidence prejudicial to the defendant will the judgment be reversed. *Id.*

¶ 41    The record in this case does not rebut the presumption that the trial court considered only competent evidence in reaching its verdict. There is no evidence in the record that the trial court accepted the supplement as an exhibit, and there is ample properly admitted evidence to support the trial court's conclusion that the defendant offered Copeland bribes to recant her story "over and over." As such, the defendant cannot demonstrate the prejudice necessary to support a claim of ineffective assistance of counsel for defense counsel's failure to object to the State's references to the supplement during its presentation of evidence. Accordingly, we hold that the defendant was not prejudiced by defense counsel's performance at trial, and his first claim therefore fails.

¶ 42                    B. Preliminary *Krankel* Inquiry

¶ 43    The defendant next argues that he was not permitted to fully assert his claims of ineffective assistance of counsel at the preliminary *Krankel* inquiry conducted in this matter. The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 44    As previously stated, a defendant has the constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To ensure that a defendant actually receives that constitutional guarantee, a trial court must inquire into a defendant's posttrial

15

claims of ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11. A *pro se* posttrial motion alleging ineffective assistance of counsel is governed by the common-law procedure developed by our supreme court in *Krankel* and refined by its progeny. *Ayers*, 2017 IL 120071, ¶ 1.

¶ 45     To trigger the trial court's duty under *Krankel*, a *pro se* defendant is not required to file a written motion, but need only bring his or her claim to the trial court's attention. *Id.* ¶ 11. A defendant "may raise the issue orally" before the trial court "or through a letter or note to the court." *Id.* Illinois courts have found that a defendant is entitled to a *Krankel* inquiry when the defendant informs the trial court of an explicit or clear complaint of defense counsel's performance or ineffective assistance of counsel. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 26.

¶ 46     When a defendant makes such a claim, the trial court should first examine the factual basis of the defendant's claim at a preliminary inquiry to determine whether counsel should be appointed and the matter should proceed to a full *Krankel* hearing. *People v. Roddis*, 2020 IL 124352, ¶ 35; *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 81. There is no set format for how an initial inquiry into a defendant's *pro se* allegations of ineffective assistance of counsel should be conducted. *Flemming*, 2015 IL App (1st) 111925-B, ¶ 81. Interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible at such an inquiry, and is usually necessary in assessing what further action, if any, is warranted; however, sometimes, brief discussion between the trial court and the defendant may be sufficient. *Id.* The trial court can also base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. *People v. Moore*, 207 Ill. 2d 68, 79 (2003). Therefore, although a trial court may conduct an initial inquiry into a defendant's

16

*pro se* allegations of ineffective assistance through a simple question-and-answer session, it need not question defense counsel at all, directly or indirectly. *Flemming*, 2015 IL App (1st) 111925-B, ¶ 85. In other words, a trial court's method of inquiry at a *Krankel* hearing is somewhat flexible. *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40.

¶ 47     Additionally, a trial court may consider both the facts and legal merits of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel at the preliminary inquiry stage. *Roddis*, 2020 IL 124352, ¶ 70. Where the claims are based on matters outside the record, an inquiry is incomplete where it fails to develop the factual record needed to resolve the claims. *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 44. A trial court can properly conclude, however, that a defendant's claims had no basis and were without merit where a defendant did not allege anything of which the trial court did not have firsthand knowledge. *Roddis*, 2020 IL 124352, ¶ 59.

¶ 48     If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then it need not appoint new counsel and may deny the *pro se* motion. *Moore*, 207 Ill. 2d at 78. In reviewing such a determination, a reviewing court must determine "whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id.* If the trial court properly conducted the *Krankel* preliminary inquiry and reached a determination on the merits of the defendant's claims, we will reverse only if the trial court's action was manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Id.*

¶ 49     In this case, the trial court addressed the defendant's allegations of ineffective assistance by asking both the defendant and defense counsel to address the claims. It also considered the evidence at trial. Regarding the first claim of ineffective assistance set forth in his motion, the defendant alleges that, while defense counsel was allowed to substantively address the defendant's

17

complaints at length, the defendant was only allowed a "scant opportunity to elaborate on or respond to this claim." He states that after the trial court allowed him to set forth his claim that he had two prior convictions rather than three, a claim that is rebutted by the PSI, he was not permitted the opportunity to complete his sentence as to that issue, and he was not permitted to speak again until the trial court had moved on to the second allegation. We briefly note that while it is not necessary for the trial court to discuss the claim regarding the defendant's prior convictions with him at all, our review of the record reveals no indication that the defendant was cut off by the trial court and prevented from completing his sentence, rather than trailing off and failing to complete the sentence himself.

¶ 50    Regarding the second claim, when the defendant was asked how he was sabotaged by defense counsel, the defendant explained that he felt that trial counsel did not adequately impeach Copeland, and that he felt trial counsel would not do anything to support his appeal. The trial court summarized the defendant's argument back to him and the defendant further elaborated on the same issue. After hearing a response from defense counsel, the trial court began to announce its ruling. Only then did the defendant interrupt the trial court and request to speak further, and the trial court stated that the defendant could speak in a second. The trial court then finished announcing its decision that, upon consideration of the pleading, statements by the defendant and counsel, and its knowledge of the trial, the defendant's claims lacked merit and would not proceed to a full *Krankel* inquiry. The defendant was then given the opportunity to briefly state whatever he wanted to add to the discussion, and the defendant then alleged that Copeland also had not been impeached regarding drug use. Regarding this portion of the hearing, the defendant claims, "neither the trial court nor this Court can know if he had other counsel-related contentions of error, but decided to forego those," and states that by not allowing the defendant to fully explain his

18

contentions, or even to raise new issues not included in his written motion, the trial court did not allow the defendant to flesh out his claims of ineffective assistance of counsel.

¶ 51    This argument is, again, clearly without merit. The defendant's written motion stated that trial counsel refused to object to a new trial, refused to object to reference to the prior domestic violence charge in Case No. 2017-CF-616, and refused to put on a viable defense. He further alleged that the public defender was going to have an assistant public defender from her office sabotage the defendant's posttrial motions for acquittal and for a new trial, and his appeal.

¶ 52    First, the defendant's written motion alleged that defense counsel would not object to a new trial. To the extent that the defendant intended to allege that defense counsel would not *move* for a new trial, defense counsel filed a well-supported motion for judgment notwithstanding the verdict or, in the alternative, for a new trial on December 7, 2023, prior to the hearing. The defendant fails to identify any substantive claim that defense counsel could have raised in the motion but did not. Defense counsel also argued the motion for a new trial at the hearing immediately following the preliminary *Krankel* inquiry. Any claim regarding refusal by defense counsel to pursue a new trial was without merit based on these facts. No further inquiry was necessary by the trial court.

¶ 53    Regarding the prior charge, the defendant was permitted to speak fully on that issue. While he appears to have trailed off mid-sentence at the end of his statement on the claim, prior to trailing off, he fully explained his position that he did not have a conviction in the 2017 domestic battery case. The PSI, however, indicates that he in fact did have a conviction in that case, and it was yet a fourth domestic battery case from 2016 where he had been granted conditional discharge. Evidence of conviction in that 2016 conditional discharge case was not offered or used at trial.

19

¶ 54    The trial court could have determined this issue based solely on the evidence at trial where, although they do not appear in the record on appeal, the trial transcript indicates that the trial court clearly received certified copies of the convictions at issue and accepted them into evidence. The PSI further corroborated the 2017 conviction. No discussion from the defendant or defense counsel was necessary for the trial court to evaluate the factual basis for this claim, and yet both were given the opportunity to be heard, and defense counsel agreed that the record supported that there was a conviction in the 2017 case. No further inquiry was necessary by the trial court.

¶ 55    Regarding his assertion that defense counsel would not put on a viable defense and wanted to sabotage his posttrial motions and appeal, the defendant was permitted to speak fully on the issue of the impeachment of Copeland. He was further given the opportunity to speak on anything he wanted to add after the trial court announced its ruling, and only added that Copeland should have also been impeached on her drug use. The record reveals that defense counsel did pursue impeachment of Copeland at trial on every issue raised by the defendant.

¶ 56    Throughout the entire hearing on the ineffective assistance of counsel claims, the defendant was only prevented from speaking on one occasion, when he interrupted the trial court's ruling, and he was allowed to speak further immediately after the trial court finished speaking. The issues raised by the defendant in his motion were adequately investigated by the trial court, and at no point was there an attempt by the defendant to add to his claims of ineffective assistance of counsel. Where the defendant claims that there was no discussion of any claims that he "had possibly tried to bring up during the inquiry," the defendant fails to direct this court to any point in the record that would demonstrate that the defendant attempted to add a claim but was prevented from doing so. Again, no further inquiry was necessary by the trial court.

20

¶ 57    While the trial court must inquire into claims of ineffective assistance of counsel, it is the defendant who must raise those claims. The defendant was never denied an opportunity to do so. On the claims he did raise, the trial court conducted an inquiry into the underlying factual basis for each item that was brought to the trial court's attention. It engaged in brief discussion with the defendant and trial counsel, and relied on its knowledge of defense counsel's performance at trial. The law requires no more. The record simply does not support the defendant's argument that he was denied the opportunity to develop his arguments or fully raise his claims of ineffective assistance of defense counsel. Because, after conducting its inquiry, the information before the trial court was sufficient for the trial court to conclude that each of the defendant's claims lacked merit, we find that the trial court's preliminary inquiry was adequate. Accordingly, where the defendant was given the opportunity to state his claims, and the trial court conducted an adequate inquiry into the factual basis for those claims, we find no error in the trial court's method of conducting its preliminary *Krankel* inquiry. We further find no error that is clearly evident, plain, or indisputable concerning the trial court's determination of the merits of the defendant's claims and, as such, find that the trial court's denial of the defendant's claims of ineffective assistance of counsel was not manifestly erroneous.

¶ 58                                    III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the defendant's convictions where the defendant was not prejudiced by defense counsel's performance at trial, the trial court conducted an appropriate preliminary *Krankel* inquiry, and the trial court's denial of the defendant's claims of ineffective assistance of counsel was not manifestly erroneous.

¶ 60    Affirmed.

21